Commonwealth, Appellant, *v.* Hall.

Argued April 12, 1970. Before WRIGHT, P. J., WATKINS, MONTGOMERY, JACOBS, HOFFMAN, SPAULDING, and CERCONE, JJ.

*Arthur R. Makadon,* Assistant District Attorney, with him *James D. Crawford,* Deputy District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellant.

*Alan J. Davis,* for appellee.

*Dennis E. Haggerty,* for appellee.

*David Rudovsky,* Assistant Defender, with him *John W. Packel,* Assistant Defender, and *Vincent J. Ziccardi,* Acting Defender, for appellee.

*Eugene H. Clarke, Jr.,* for appellee.

OPINION BY HOFFMAN, J., September 18, 1970:

At 9 o'clock one evening in 1968, Victor Tomassini was attacked by a group of young men on a street in Philadelphia. After beating and robbing Tomassini, the group fled to a nearby house. Police officers began arriving at that house at about 9:05 p.m. and entered immediately to make arrests. Appellee Rosser was arrested by Lieutenant Handel and taken immediately to Episcopal Hospital, where Tomassini had been taken

for treatment. According to Lieutenant Handel's testimony, ten minutes elapsed between the time of his arrival at the house and his arrival at Episcopal Hospital. At the time of appellee Rosser's arrest, appellees Hood and Berry were arrested by Sergeant Kennedy at Episcopal Hospital, but they arrived when Lieutenant Handel and appellee Rosser were leaving. Sergeant Harrington arrested appellees Ronald and Earl Hall. He did not testify, however, and we do not know whether they, too, were taken to Episcopal Hospital.

At the hospital, Lieutenant Handel brought appellee Rosser into the accident ward. Inside, they found Tomassini at the registration desk, where he was awaiting treatment. He looked at appellee Rosser and said: "That's one of the men." Lieutenant Handel then left with appellee Rosser to take him to the station house. Tomassini presumably was then taken into a "back room" to receive treatment. Other police officers with other suspects arrived at the hospital and gathered in the accident ward. Among them were Sergeant Kennedy and appellees Hood and Berry. The entire group of suspects numbering eight to ten, was taken into the "back room" and lined up against a wall. According to Sergeant Kennedy, Tomassini thereupon identified appellees Hood and Berry as two of his assailants. He identified others, too. Tomassini, on the other hand, could only recall identifying Berry. He could not recall identifying Hood, nor either of the Hall brothers, although Sergeant Kennedy recalled hearing the name "Hall" at the hospital. At no time during this period was Tomassini in such a condition that hospital officials or the police thought he was in danger of dying or lapsing into unconsciousness so as to preclude his making an identification.

In any case, appellees Rosser, Hood, Berry, Ronald and Earl Hall were taken to the station house together with three other suspects. When Tomassini arrived

from the hospital, all eight were brought out to confront him. This time, he identified all five of the appellees and, according to a detective present, another young man. The latter was never tried, however.

About a week later, all five appellees appeared for their preliminary hearing. They were unrepresented at the hearing, during the course of which Tomassini again confronted all of them.

Prior to trial, appellees moved to suppress Tomassini's three out-of-court identifications and his in-court identification of them. They contended that since no lawyer was present at any of the out-of-court identifications, the identifications were inadmissible under *United States v. Wade,* 388 U.S. 218, 87 S. Ct. 1926 (1967). Accordingly, it was the Commonwealth's burden to show by "clear and convincing evidence that the in-court identifications were based upon observations of the suspect[s] other than the [out-of-court] identification[s]." Id. at 240, 87 S. Ct. at 1939. Judge Mc-GLYNN did not reach the second question because he ruled that the out-of-court identifications were not inadmissible under *Wade.*

At trial, Tomassini identified appellees as his assailants. He indicated that he had seen all of them before the attack, some of them several times. At no time did he or anyone else describe the out-of-court identifications.[1] On the basis of Tomassini's testimony

---

[1]During Tomassini's testimony, the following appears of record: "[By the district attorney]: So then what happened to you? Were you taken anywhere? "A. The police officer took me to Episcopal Hospital. "Q. And there were you treated for your wounds? "A. I was. "Q. Did you identify any of these boys at that time, while you were in the Episcopal Hospital? "A. I remember I identified two of them. "Q. Did you identify Rosser? "A. Rosser. "[Defense counsel]: Objection, Your Honor. "THE COURT: I will sustain the objection. "[The District Attorney]: Sir, that is a proper question. "THE COURT: I don't know that it is yet. His identification has not been attacked. "[The district attorney]: All

and the testimony of several police officers, the jury convicted appellees of aggravated robbery.

Appellees filed motions for a new trial, alleging that Judge McGLYNN had erred with respect to the *Wade* issue.[2] Upon review of the cases, Judge McGLYNN indicated that he still was of the opinion that *Wade* had not been violated. He did believe, however, that *Commonwealth v. Lee*, 215 Pa. Superior Ct. 240, 257 A. 2d 326 (1969), "greatly expand[ed] the rule of Wade" and required a new trial. He did not indicate, however, what he believed *Lee* required: whether the out-of-court identifications were inadmissible, whether the in-court identifications were inadmissible, or whether all of the identifications were inadmissible. Had there been out-of-court identifications admitted at trial, then Judge McGLYNN's order would have been clear. *Lee*

right, since the identification hasn't been attacked, I will withdraw the question." As is evident, Tomassini said "Rosser" before defense counsel could object. There is no indication what Tomassini meant, however, by his cryptic remark. We cannot tell whether he was merely repeating what the district attorney had just said or whether he was in the middle of a sentence. We cannot believe the jury understood the remark any better than we. *Harrington v. California*, 395 U.S. 250, 89 S. Ct. 1726 (1969). During Lieutenant Handel's rebuttal testimony, the following appears of record: "[by the district attorney]: What did you do after you arrested [Rosser]? "A. He was in my custody. From there I took him to the Episcopal Hospital, and then to the East Detectives. "Q. Did you see anyone at the Episcopal Hospital? "A. Yes. I saw the complainant, Mr. Tomassini. "Q. Did Mr. Tomassini see Mr. Rosser? "[Defense counsel]: Objection. "THE COURT: Sustain the objection." At no other time were out-of-court identifications sought to be admitted before the jury.

[2] It was not urged below that Judge McGYLNN's post-trial review of his own pre-trial ruling was in violation of *Commonwealth v. DeMichel*, 214 Pa. Superior Ct. 392, 257 A. 2d 608 (1969). Certainly a judge may change his mind. So long as he does so post-trial, thus preserving the Commonwealth's opportunity to appeal the question of law, he should be permitted to change his mind. See Part I, infra.

required that if invalid out-of-court identifications were admitted at trial, a new trial must be held without such evidence. There was no such evidence, however. It would seem, therefore, that Judge McGlynn must have ruled with respect to the in-court identification and have decided they were "tainted". However, were such the case, rather than granting a new trial, he should have arrested judgment, since only Tomassini could identify appellees as his assailants. It would seem, therefore, that Judge McGlynn did not differentiate between the two kinds of identifications.

The Commonwealth contends that it is aggrieved on at least two grounds. It does not believe the out-of-court identifications were inadmissible. But even if they were, it seeks the opportunity to show that the in-court identifications were not tainted. If it does not have that opportunity, it finds itself precluded from submitting Tomassini's testimony at a new trial. Hence it appeals.

## I

### The Right of The Commonwealth to Appeal

While it is true that the Commonwealth is without a right to appeal where the trial court grants a new trial based upon an admixture of law and fact, *Commonwealth v. Hartman,* 383 Pa. 461, 462-463, 119 A. 2d 211, 212 (1956), where a pure question of law is the basis of the order, it may appeal. *Commonwealth v. Dolan,* 155 Pa. Superior Ct. 453, 455-456, 38 A. 2d 497, 498 (1944). With respect to the latter, the Supreme Court has held that "where the question involved is purely one of law . . . the Commonwealth may appeal from an adverse ruling in a criminal case, for example, where a new trial is granted to a convicted defendant on the sole ground that the introduction of certain evidence at his trial was prejudicial error (Common-

wealth v. Antonini, 165 Pa. Superior Ct. 501, 69 A. 2d 436) . . ." *Commonwealth v. Melton*, 402 Pa. 628, 629, 168 A. 2d 328, 329 (1961).

In *Antonini*, the trial court granted a new trial because it believed certain evidence admitted on behalf of the Commonwealth was erroneously admitted. On the basis of that error alone, it granted a new trial. In the instant case, certain in-court identifications were introduced by the Commonwealth. Compelled solely by our decision in *Lee*, Judge MCGLYNN concluded, evidently, that those identifications were admitted erroneously. On the basis of that error alone, he granted a new trial. Judge MCGLYNN's interpretation of *Lee* is the keystone of his action. We cannot say the construction of one of our cases is not a question of law.

By quashing this appeal, this Court would place the Commonwealth on the horns of a dilemma. If it tries the appellees once again, it subjects itself to the possibility that the trial judge will find himself bound by Judge MCGLYNN's order and exclude Tomassin's in-court identification. Should that happen, it is likely that a demurrer to the Commonwealth's case would be sustained. If it seeks pretrial relief, it may subject itself to the same possibility that a judge will find himself bound by Judge MCGLYNN's order. In that case, it might appeal. That appeal, however, would raise the same issue presently before us. Should it secure pretrial relief, however, the appellees would face a second trial identical to the first trial, despite having secured a new trial based on supposed error at the first trial. Such a situation would be intolerable.

## II

### The Out-of-Court Identifications

Three out-of-court confrontations concern us in this appeal: (1) the confrontation between appellees Ros-

ser, Hood, and Berry and Tomassini at Episcopal Hospital; (2) the confrontation between all five appellees and Tomassini at the police station; (3) the confrontation between all five appellees and Tomassini at the preliminary hearing. Since all three confrontations were arranged by the police, the "grave potential for prejudice" inherent in such confrontations requires us to decide whether the state should have furnished appellees counsel or, in the absence of such, whether the state should have conducted the confrontations at all. *United States v. Wade,* supra at 236, 87 S. Ct. at 1937.

With respect to confrontations generally, the Supreme Court has noted that "the confrontation compelled by the State between the accused and the victim or witnesses to a crime to elicit identification evidence is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial. . . . A major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification. . . . The pretrial confrontation for purpose of identification may take the form of a lineup, also known as an 'identification parade' or 'showup' . . . or presentation of the suspect alone to the witness . . . It is obvious that risks of suggestion attend either form of confrontation and increase the dangers inhering in eyewitness identification." Id. at 228-229, 87 S. Ct. at 1933.

All confrontations between victim or witness and the suspect are potentially suggestive. The mere fact that the police have selected half a dozen or a dozen suspects focuses the victim's and the witness' attention to those few. The limitations in our perception and recall and the emotional impact of a police-staged meeting make suggestion almost inevitable. The Supreme

Court has, in effect, said that when the potentiality of suggestion is strong, counsel should be present to "avert prejudice and assure a meaningful confrontation at trial." Id. at 236, 87 S. Ct. at 1937.

Not all confrontations, however, are equally prejudicial. The closer the confrontation to the time of the crime, the greater is the likelihood that the victim or witness can recall the image of the criminal. Similarly, the less the environment of the criminal episode has changed, the fewer the extraneous factors of suggestion that adhere to any confrontation between victim or witness and suspect. Thus, less prejudice is likely at fresh on-the-scene confrontations than at late, police station confrontations, all other things being equal.

In accord with such reasoning, three distinguished federal judges have decided that fresh on-the-scene confrontations do not require the presence of counsel. In *United States v. Sanchez*, 422 F. 2d 1198 (2d Cir. 1970), the defendants were followed from the scene of the crime by several private citizens. In the subway, two blocks away, they were arrested. When they protested their innocence, the police took them back to the scene of the crime, where, thirty minutes after the crime and almost immediately after arrest, they were identified by several witnesses. Circuit Judge FEINBERG, speaking for Judges KAUFMAN, PALMIERI, and himself, held that such an identification was not governed by *Wade*. In *Russell v. United States*, 408 F. 2d 1280 (D.C. Cir. 1969), a private citizen reported the description of a suspicious person who had emerged from a store with a broken window. Responding to a radio look-out, a squad car proceeded to the scene. The officers in the car spotted the defendant on the way. He matched the radioed description and fled from the approaching car. "They arrested him and drove him to the . . . shop where [the private citizen] identified him as the man he had seen coming out of the shop." Id. at 1281. Chief Judge

BAZELON, speaking for Judges DANAHER and ROBINSON, held that this identification, too, was not governed by *Wade*. Judge BAZELON wrote as follows: "Unquestionably, confrontations in which a single suspect is viewed in the custody of the police are highly suggestive. Whatever the police actually say to the viewer, it must be apparent to him that they think they have caught the villain. Doubtless a man seen in handcuffs or through the grill of a police wagon looks more like a crook than the same man standing at ease and at liberty. There may also be unconscious or overt pressures on the witness to cooperate with the police by confirming their suspicions. And the viewer may have been emotionally unsettled by the experience of the fresh offense. Yet, on the other hand, recognition of a person or face would seem to be as much the product of a subjective mental image as of articulable, consciously remembered characteristics. A man may see clearly in his 'mind's eye' a face or a figure which he is hard put to describe adequately in words. Though the image of an 'unforgettable face' may occasionally linger without any translation into words, photographic recall is most often ephemeral. Vivid in the flash of direct observation, it fades rapidly with time. And the conscious attempt to separate the ensemble impression into particular verbalized features, in order to preserve some recollection, may well distort the original accurate image so that it is the verbalized characteristcis which are remembered and not the face or the man. Balancing all the doubts left by the mysteries of human perception and recognition, it appears that prompt confrontations in circumstances like those of this case will 'if anything promote fairness, by assuring reliability. . . .' This probability, together with the desirability of expeditious release of innocent suspects, presents 'substantial countervailing policy considerations' which we are reluctant to assume the Supreme Court would re-

ject." Id. at 1284. Likewise, in *United States v. Davis,* 399 F. 2d 948 (2d Cir. 1968), the defendant was arrested on the New York Thruway because he had been a pedestrian thereon, a violation of the Vehicle and Traffic Law. The arresting officer had also been suspicious of a car parked on the Thruway. While taking the defendant back to the police station, the officer stopped at a toll booth and asked the collector whether he had ever seen the defendant before. The collector identified the defendant as the driver of the car under suspicion. Circuit Judge FRIENDLY, speaking for Judges MOORE, BRYAN, and himself, held that this identification, too, was not governed by *Wade.* "It is hard to believe the Court meant to prevent an officer from making such a *routine, uncontrived* inquiry and to require that the victim and the bystanders be carted off to a police station, held on the spot until counsel could be provided, or dismissed until a lineup attended by counsel could be arranged at some later time." Id. at 951 [Emphasis added.]

While on-the-scene confrontations may well be permissible without the benefit of counsel, when the scene changes or when the time becomes late, our view must be governed by *Wade.* When an identification takes place at a hospital, the victim no longer has the scene clearly in view. The background has changed, the lighting is different, the suspect against the bland walls is more vivid. The fact that the police have thought enough of the suspect to take him to the hospital bears on the victim's mind. In short, the possibility of both suggestion and misidentification increase perceptibly. Where the victim is not in extremis, there is no reason not to wait until a formal line-up with counsel can be arranged at the hospital or, as in this case, until the victim can be brought to the police station where a formal line-up with counsel can be held. Cf. *McRae v. United States,* 420 F. 2d 1283 (D.C. Cir. 1969) [one-

on-one confrontation at hospital four hours after crime held in violation of *Stovall v. Denno,* 388 U.S. 293, 87 S. Ct. 1967 (1967)]. Similarly, when an identification takes place at a police station, even soon after the commission of the crime, the possibility of suggestion and misidentification increase so greatly that, absent extraordinary circumstances, a lawyer must be present at any confrontation. See *Commonwealth v. Lee,* supra. Cf. *Foster v. California,* 394 U.S. 440, 89 S. Ct. 1127 (1969) [several one-on-one identifications at a police station a week or so after the crime held in violation of *Stovall*]. Finally, when an identification takes place in a courtroom at a preliminary hearing, there is no justification whatever for the absence of counsel. See *Coleman v. Alabama,* 399 U.S. 1, 90 S. Ct. 1999 (1970) [counsel now required at preliminary hearing]; *Mason v. United States,* 414 F. 2d 1176 (D.C. Cir. 1969) [identification of uncounseled defendant at preliminary hearing held in violation of *Wade*].

Thus, as Judge McGLYNN apparently concluded, all three out-of-court identifications were violative of *Wade.* No compelling circumstances warranted taking appellees to the hospital, since there was no indication that Mr. Tomassini was in extremis. Were the police solicitous of not holding possibly innocent persons until treatment was completed, a formal line-up with counsel should have been arranged. A fortiori, such should have been the procedure once Mr. Tomassini was brought back to the police station. And of course, appellees should have had counsel at the preliminary hearing, where the third confrontation took place.

## III

## The In-Court Identifications

Having decided the out-of-court identifications were violative of *Wade,* our review of Judge McGLYNN's

order is not complete. As mentioned earlier, no out-of-court identification was described at trial. In-court identifications, however, were made by Mr. Tomassini. The proper task for the trial judge (in most instances, the pre-trial judge) is that outlined in *Wade*. The Commonwealth must be given "the opportunity to establish by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the lineup identification." *United States v. Wade,* supra at 240, 87 S. Ct. at 1939.

"Application of this test in the present context requires consideration of various factors; for example, the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the [appellees'] actual description, any identification prior to lineup of another person, [any] identification by picture of the [appellees] prior to the lineup, failure to identify the [appellees] on a prior occasion, and the lapse of time between the alleged act and the lineup identification. It is also relevant to consider those facts which, despite the absence of counsel, are disclosed concerning the conduct of the lineup." Id. at 241, 87 S. Ct. at 1940.

No such opportunity was given the Commonwealth in the instant case. *Wade* requires that the opportunity be given. *Lee,* concerned solely with out-of-court identifications admitted at trial, certainly does not require the contrary. To quash this appeal would deprive the Commonwealth of a substantial right, in violation of good precedent and common sense.

The case is remanded for the court below to hold a' hearing at which the Commonwealth will have the opportunity to demonstrate that the in-court identification by Mr. Tomassini was not tainted by the unlawful out-of-court identifications.

## IV

Appellees also raise several other issues in this appeal, not ruled upon, which they argue can justify the order below. Rather than ruling on these issues at this juncture, the court is instructed to consider them upon remand. Regardless of its disposition with respect to the *Wade* issue, the court should indicate its disposition of these other issues, should there be another appeal.

The order of the court below is reversed and the record is remanded for proceedings consistent with this opinion.

WATKINS and JACOBS, JJ., dissent.

------

CONCURRING OPINION BY CERCONE, J.:

I believe that the confrontations at the hospital where the victim identified two of the defendants were within the permissible limits of *United States v. Sanchez*, 422 F. 2d 1198 (2d Cir. 1970). It should be noted that in the record it is only definite that defendants Rosser and Berry were identified by Mr. Tomassini at the hospital. However, I believe that the later confrontations at the police station and the preliminary hearing were in violation of the holdings of *United States v. Wade*, 338 U.S. 218, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967) and *Commonwealth v. Lee*, 215 Pa. Superior Ct. 240, 257 A. 2d 326 (1969). In my opinion, the identifications at the police station were improperly conducted and carried a strong potentiality of suggestion, as in the *Lee* case, supra. Also, it is my feeling that the defendants were entitled, under *Wade*, supra, to the assistance of counsel at these times.

I believe the case should be remanded for a hearing, at which the Commonwealth should be given the op-

portunity to demonstrate that the identifications by Mr. Tomassini at the trial were not tainted by the unlawful out-of-court identifications at the police station and at the preliminary hearing.