396 A.2d 1221

COMMONWEALTH of Pennsylvania, Appellee,

v.

Randolph ROSE, Appellant.

Supreme Court of Pennsylvania.

Submitted Oct. 19, 1978.

Decided Jan. 24, 1979.

384

Nicholas J. Nastasi, Philadelphia, for appellant.

Edward G. Rendell, Dist. Atty., Steven H. Goldblatt, Deputy Dist. Atty., Robert B. Lawler, Chief, Appeals Div., Paul S. Diamond, Asst. Dist. Attys., for appellee.

Before EAGEN, C. J., and ROBERTS, NIX, MANDERINO and LARSEN, JJ.

## OPINION OF THE COURT

EAGEN, Chief Justice.

On January 30, 1976, appellant, Randolph Rose, was convicted by a jury in Philadelphia of murder of the second degree and of robbery. Following a denial of post-verdict motions, a sentence of life imprisonment was imposed on the murder conviction. A prison sentence of ten to twenty years was imposed on the robbery conviction, such sentence to be served consecutively to the sentence of life imprisonment. Rose filed a direct appeal in this Court from the judgment of sentence on the murder conviction. The judgment of sentence on the robbery conviction was appealed to the Superior Court, which certified that appeal to this Court.

Rose advances numerous assignments of error in support of reversal of the judgments. The judgments of sentence will be affirmed.

The record establishes the following:

Between midnight and 12:30 a. m. on August 8, 1975, Robert Edwards was found shot in the back on a street near 41st and Powelton Avenue in West Philadelphia. According to Edwards, he was approached from the rear by a man who, placing a pistol against Edwards' left temple, demanded money. As Edwards complied and handed $7.00 to his assailant, he heard a gun go off, attempted to escape, and realized he had been shot in the back. He fell to the sidewalk with his head facing in the direction of a street light located approximately ten feet away. His assailant stopped under the street light and faced Edwards for a period of about ten seconds, during which time Edwards was able to observe him. At trial, Edwards identified Randolph Rose as the man who robbed and shot him.

At about 1:20 a. m. the same day, Russell A. Leary, who had been shot in the back, was discovered lying on the sidewalk near 40th and Ludlow Streets in Philadelphia. On the sidewalk in the vicinity of the victim were strewn his personal effects, i. e., his leather key case, cigarette lighter, and wallet. Mr. Leary was transported to Philadelphia

General Hospital where, at 2:20 a. m., he was pronounced dead.

An autopsy performed on Leary's body by Dr. Robert J. Segal, Assistant Medical Examiner for the City of Philadelphia, revealed the cause of death was a single bullet wound of the back which caused injury to the lungs, liver, abdomen, and inferior vena cava (a large vein leading to the heart). A .32 caliber bullet was removed from the body. Dr. Segal testified that, based on his experience and training, in his opinion the firearm which caused the injury had been held a distance of one-half to one inch from Leary's back when it was fired. The bullet, upon removal from Leary's body, was immediately rushed to the Ballistics Laboratory at the Police Administration Building by Detective William Brown, who was present during the autopsy, and submitted to ballistics tests.

At approximately 1:30 a. m. on the same day, Gary Crosley was approached near 13th and Filbert Streets in Philadelphia by a man wanting to sell him a wrist watch for ten dollars. Crosley expressed disinterest in the watch, but, as the two were walking in the same direction, conversation developed. Deciding to stop for coffee, they proceeded to the Trailways Bus Terminal at 13th and Arch Streets. The two men remained at the terminal some two to three hours and engaged in conversation while seated across the table from one another in a well-lit area.

Sometime around 5:00 a. m., Crosley became tired and decided to walk to the subway to make his way home. His companion followed and, once inside the subway station, demanded that Crosley give him money. After Crosley explained he had only enough money for subway fare to his home, his companion produced a revolver. He fired the gun at Crosley who, in fear, had begun running towards the subway terminal steps. A bullet struck Crosley in the nape of the neck.

Though injured, Crosley continued his escape a short distance to City Hall Annex where a guard summoned police assistance. Within moments, Officer James Feldmayer ar-

rived by patrol car at the Annex and immediately transported Crosley to Hahnemann Hospital for emergency treatment. En route to the hospital, Crosley was able to provide Officer Feldmayer with a description of his assailant. The description was immediately broadcast over police radio.[1]

Officer Robert Hinkel, also in a police patrol car in the area, received the description provided by Crosley as he was patrolling in the area of 13th and Market Streets. In less than one to one and one-half minutes after receiving the radioed description, Hinkel, as he turned north on 13 Street, observed two men walking south on 13th Street from Commerce Street. One of the men, namely, Randolph Rose, matched the description. Hinkel immediately confronted the two men and, as the result of a search, discovered Rose had in his possession a chrome plated .32 caliber five-shot revolver containing one spent shell casing and four live rounds of ammunition. The revolver and shells were immediately sent to the Ballistics Laboratory at the Police Administration Building for testing.

Randolph Rose and the person with whom he had been walking were immediately taken into custody in connection with the Crosley shooting and transported by police to Hahnemann Hospital. Within eight to ten minutes after the shooting, Rose and his companion were brought before Crosley as he lay in the emergency room of the hospital awaiting treatment. Crosley unequivocally identified Rose as his assailant. Thereafter, Rose was transported to the Police Administration Building.

At 5:45 a. m., after Crosley had identified him, Rose was charged with the Crosley shooting. He was given the warnings mandated by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), [hereinafter: *Miranda* ], by Detective James O'Hara. Rose stated: "I don't want to

---

1. Officer Feldmayer testified:

   "The complainant told me it was a Negro male, approximately twenty-two to twenty-three years of age, approximately five foot nine, wearing a brown leather jacket and blue dungarees.

   "By the time I had put out the flash information, I had arrived at Hahnemann Hospital."

make any statements or sign any papers. That's it." All interrogation ceased at that point.

At 7:50 a. m., after police became aware of similarities in the Leary and Crosley incidents, Rose was transferred to the Homicide Division where he was placed in a cell. At 9:45 a. m., he was taken from his cell to an interview room in the Police Administration Building. He was informed that the police were awaiting results of ballistics tests of the bullet removed from the body of Russell Leary and that, due to similarities in the shootings, he would be questioned regarding the Leary killing.

At 10:30 a. m., he was given a cigarette, coffee, and an egg sandwich. Meanwhile, the .32 caliber bullet, which had lodged in Crosley's head behind his left ear, was removed at Hahnemann Hospital and taken to the Ballistics Laboratory at the Police Administration Building for testing.

The bullet removed from Mr. Crosley's head and the bullet which caused Leary's death were examined by Mr. Anthony Paul, Supervisor of the Firearms Identification Unit of the Philadelphia Ballistics Laboratory. Microscopic examination revealed the bullets were fired from the same weapon. Further tests revealed the chrome plated .32 caliber five-shot revolver taken in the search of Randolph Rose was the weapon used in each shooting.

At 11:45 a. m., the results of the ballistics tests became known to police, and Rose was advised he was now charged with the Leary homicide. When confronted with the new charges against him and the results of the ballistics tests, Rose was again given *Miranda* warnings and, contrary to his previous disposition, waived his rights and provided police with a statement in which he confessed to the Leary slaying. Rose was tried and convicted of the robbery and homicide of Russell Leary.

Rose argues the court below erred in failing to suppress testimony regarding the "two-on-one" identification of Rose by Crosley at the hospital and the 11:45 a. m. state-

ment made by him.[2]  The facts in the instant case are strikingly similar to those in *United States ex rel. Tyrrell v. Jeffes,* 420 F.Supp. 256 (E.D.Pa.1976), cert. denied, 430 U.S. 958, 97 S.Ct. 1606, 51 L.Ed.2d 808 [hereinafter: *Tyrrell*].  In *Tyrrell,* a police officer was shot in the head in the early morning while investigating a robbery.  He was taken to a hospital.  Before the officer's physical condition was ascertained, Tyrrell, the suspect, was also taken to the hospital at 6:00 a. m., and, in a "one-on-one" showing, the police officer identified Tyrrell as his assailant.  In ruling testimony recounting the "one-on-one" identification admissible, the District Court for the Eastern District of Pennsylvania, considering the "totality of the circumstances"[3] surrounding the identification, stated:

"[i]t would be crucial to know whether the suspect, whose only connection with the crime was [a] radioed description . . . was in fact the assailant, in order to enable the police to decide whether to continue the investigation. Any delay for the purpose of obtaining participants for a regular lineup would have been excessive, particularly given the hour and the day.  It would have been difficult to obtain counsel at that moment, and the [victim] could not have been expected to be able to attend a lineup in his physical condition.  Moreover, the uncertainty of his physical condition was another legitimate factor to be weighed in deciding upon the procedure which was adopted." *Tyrrell, supra* at 264.

In the instant case, Crosley was shot in the nape of the neck, the bullet lodging in his head behind his left ear. Although he was alert en route to and at the hospital, police could not be sure he would not lapse into unconsciousness or

**2.** Rose contends the statements made by him subsequent to his arrest flow from an illegal identification, and must be suppressed as the "fruit of the poisonous tree."  See *Wong-Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).  Since we hold the identification was not illegal, this contention is without merit.

**3.** "[A] claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it . . . ." *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967).

ascertain with reasonable certainty the seriousness of his physical condition, nor could they be sure he would ever be able to attend a regular lineup at the police station. As in *Tyrrell,* Crosley identified Rose as his assailant only a short time after the two had been together. In fact, in the instant case, the two men had been together for a period of hours in a well-lit area preceding the incident, and the identification took place within ten minutes of the shooting.

Rose relies upon *Commonwealth v. Hall,* 217 Pa.Super. 218, 269 A.2d 352 (1970) [hereinafter: *Hall*], to support his argument. Such reliance is misplaced. Although testimony recounting out-of-court identifications in *Hall,* was held inadmissible, and although the fact that the initial confrontation took place in a hospital rather than at the scene of the crime was considered, the Superior Court stated: "Not all confrontations, however, are equally prejudicial. The closer the confrontation to the time of the crime, the greater is the likelihood that the victim or witness can recall the image of the criminal." *Hall, supra,* 217 Pa.Super. at 226, 269 A.2d at 356. Further, the court considered that "[a]t no time . . was [the victim] in such a condition that hospital officials or the police thought he was in danger of dying or lapsing into unconsciousness so as to preclude his making an identification." *Hall, supra,* 217 Pa.Super. at 220, 269 A.2d at 354. Indeed, the victim had been beaten but was able later that same day to attend a formal lineup at police headquarters. Thus, "[n]o compelling circumstances warranted taking [the assailant] to the hospital, since there was no indication that the victim was in extremis." *Hall, supra,* 217 Pa.Super. at 229, 269 A.2d at 358.

Instantly, the exigencies of the moment, i. e., Crosley being seriously injured with a bullet lodged in his head, must be contrasted with the circumstances and extent of injury which existed in *Hall.*

The seminal case of *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) [hereinafter: *Stovall*], also involved an out-of-court in-hospital confrontation between the victim of a crime and her alleged assailant. In

*Stovall,* the victim of a stabbing was hospitalized. Two days later, the police, without affording her alleged assailant Stovall time to retain counsel, arranged for a confrontation at the hospital where the victim was being treated. Present along with Stovall in the hospital room where the confrontation took place were five policemen, two members of the district attorney's office, and the victim. Stovall, the only black man in the room, was handcuffed to one of the policemen. The victim identified Stovall as the man who had stabbed her. The court, ruling testimony recounting the out-of-court identification admissible, stated:

"The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned. However, a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it, and the record in the present case reveals that the showing of Stovall to [the victim] in an immediate hospital confrontation was imperative." [Footnote omitted.] *Stovall, supra* at 302, 87 S.Ct. at 1972.

Our review of the record in the instant case convinces us the "one-on-two" hospital confrontation, considering the "totality of the circumstances," was imperative. We have considered the serious nature of Crosley's injury, the minimal time between the shooting and the identification, the fact that Rose, when apprehended, matched perfectly the description given only moments before by Crosley to police, and the length of time Rose spent with Crosley that evening in a well lit area.

Further similarities with *Stovall* exist.

"Here was the only person in the world who could exonerate Stovall. [The victim's] words, and only [the victim's] words, 'He is not the man' could have resulted in freedom for Stovall. . . . No one knew how long [the victim] might live. Faced with the responsibility of identifying the attacker, with the need for immediate action and with the knowledge that [the victim] could not visit the jail, the police followed the only feasible procedure and took Sto-

vall to the hospital room." *Stovall, supra* at 302, 87 S.Ct. at 1972.

So too, Crosley was the only person who could, in reality, provide Rose with his freedom. Due to Crosley's serious injury, he could not visit the police station. A usual police station lineup was not possible. Immediate action was necessary. Thus, considering the "totality of the circumstances," the confrontation did not violate Rose's due process rights.

Rose argues the evidentiary use of the statement he gave police concerning the Leary homicide constitutes reversible error because the statement was not voluntary. We find this argument to be meritless. A suppression court heard all the evidence relating to the circumstances under which the statement was obtained. The suppression court found Rose's statement to police to have been voluntarily given. We find no reason to disturb this ruling.

Rose cites three specific reasons to support his contention that the statement was involuntary. First, he argues the testimony that he had been drinking the previous night is "uncontradicted." However, a number of witnesses who saw Rose the night of the Leary homicide testified he was sober at that time. Further, witnesses testified that, *at the time the statement was given* to police, Rose was not under the influence of liquor. Even if we accept as true that Rose had been drinking the night before the statement was given, that is not sufficient to negate a suppression court's finding that the statement was voluntary, particularly where there was testimony that Rose was alert *at the time the statement was given. Commonwealth v. Kichline,* 468 Pa. 265, 361 A.2d 282 (1976); *Commonwealth v. Smith,* 447 Pa. 457, 291 A.2d 103 (1972).

The second factor Rose presents for our consideration is that he did not give the statement until after he had been confronted with the positive results of the ballistics test and with information that Mr. Edwards would live and most likely be able to identify his assailant. There is no prohibi-

tion against the police confronting a suspect with incriminatory evidence and doing so does not render a confession involuntary. *Commonwealth v. McFadden*, 470 Pa. 604, 369 A.2d 1156 (1977); *Commonwealth v. Wright*, 460 Pa. 247, 332 A.2d 809 (1977); *Commonwealth v. Fogan*, 449 Pa. 552, 296 A.2d 755 (1972).

Third, Rose asserts that he had been continuously awake some twenty-seven and one half hours prior to providing police with the statement. Even if this is accepted, an assertion of "tiredness" is not a sufficient ground to reverse a finding of voluntariness by the suppression court where there is testimony that the accused was alert and in possession of his senses. *Commonwealth v. Kichline, supra.*

Rose further argues the statement should have been suppressed because he indicated to the police during the 11:45 a. m. interview that he wished to remain silent.[4] "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." [Footnote omitted.] *Miranda v. Arizona, supra,* 384 U.S. at 474, 86 S.Ct. at 1627–8. See also *Commonwealth v. Nahodil*, 462 Pa. 301, 341 A.2d 91 (1975); *Commonwealth v. Grandison*, 449 Pa. 231, 296 A.2d 730 (1972). In the instant case, Rose provided a statement during the 11:45 a. m. interview. However, in the midst of the statement, Rose expressed a desire to remain silent.[5] Despite this, police continued to question him and Rose provided additional information.

4. Rose did not assert at any stage of these proceedings, nor does he now assert, that the exercise of his right to remain silent when questioned by Detective O'Hara at 6:00 a. m. should affect the admissibility of the statement he provided police in the Leary homicide at 11:45 a. m. But, as to this type of situation, see *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).

5. During the 11:45 a. m. interview after Rose had given the police a recount of the Leary homicide, the following ensued:
"Q. Will you sign this statement that you have just given myself and Detective Formicola?
"A. I'd rather not.

At trial, the Commonwealth offered testimony recounting only that part of the statement made *before* Rose indicated a desire to remain silent. No reference was made to anything Rose said after he invoked his right to remain silent. There was no error in allowing testimony concerning what Rose said before he invoked his right to remain silent.

Rose further argues the trial court erred in refusing his request for a mistrial when it was learned that a Commonwealth witness, Robert Edwards, had undergone psychiatric treatment due to the injury he received from being shot by Rose. Edwards testified, on direct examination, that Rose robbed and shot him the same morning as the Leary homicide. During the course of cross-examination, the following occurred:

"Q. Sir, I would like to ask you, forget about everything that happened between that night and now and take your memory back to August 8, 1975. Can you tell us here and now that then and there your assailant had brown pants on?

"A. No.

"Q. Why is that?

"A. Because I refuse to go back to thinking about that."

Almost immediately thereafter, the district attorney requested a side-bar conference, and informed the court and defense counsel that Edwards had voluntarily submitted to treatment at the Psychiatric Unit of the University of Pennsylvania Hospital due to hostilities engendered by the shooting incident. At that point, defense counsel moved for a mistrial.

Rose contends that, due to the holding in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) [hereinafter: *Brady*], the failure of the Commonwealth to

"Q. Why?
"A. Cause I ain't sure I should be telling you this shit. I'm just hanging myself.
"Q. I would like you to sign it and check it out for accuracy.
"A. Man, if I got to sign it, I ain't going to say anything else."
Thereafter, police continued to question Rose concerning the Leary homicide.

voluntarily disclose information regarding Edwards psychological treatment prior to trial was grounds for a mistrial, and that the court below erred in denying his motion for a mistrial.

In *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) [hereinafter: *Agurs*], the United States Supreme Court discussed the framework, scope, and application of *Brady* to different situations. *Agurs* explained that, under certain circumstances, the failure to disclose *material information* by the prosecutor violates a defendant's right to a fair trial as mandated by due process. However, the "materiality" of a given piece of information is to be determined by different criteria in each of three distinct situations where a *Brady* objection may be interposed.

First, the Court discussed convictions obtained through the use of testimony which the prosecutor knew, or should have known to be perjured. "[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside *if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.* . . . In [such] cases the Court has applied *a strict standard of materiality,* not just because they involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process." [Footnotes omitted.] [Emphasis added.] *Agurs, supra* at 103–4, 96 S.Ct. at 2397. The instant case does not present a situation involving perjured testimony. Therefore, the standard of strict materiality applied in "perjured testimony" cases is not applicable to the instant case.

The second situation, illustrated by *Brady*, is characterized by a pretrial request for specific information by the defense.

"In *Brady* the request was specific. It gave the prosecutor notice of exactly what the defense desired. Although there is, of course, no duty to provide defense counsel with unlimited discovery of everything known by the prosecutor, *if the subject matter of such a request is material, or indeed if a substantial basis for claiming materiality ex-*

*ists*, it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge. When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable." [Emphasis added.] *Agurs, supra* at 107, 96 S.Ct. at 2399.

Where a specific request is made, evidence is material if it *"might have affected the outcome of the trial." Agurs, supra* at 104, 96 S.Ct. at 2398. In the instant case, no such specific request was made by the defense. Thus, this standard of materiality does not apply.

■ *Agurs*, dealt with a third situation—where a general request for *"Brady* materials" is made. After stating that such a general request puts the prosecutor on no better notice than had no request been made at all, the Court went on to state: "If there is a duty to respond to a general request . . ., it must arise from the obviously exculpatory character of certain evidence in the hands of the prosecutor." *Agurs, supra* at 107, 96 S.Ct. at 2399. Thus, where no request is made or where only a general request is made, the Commonwealth has the burden of providing the defense with evidence which is material. This burden arises because of the obviously exculpatory nature of the evidence. See *United States ex rel. Marzeno v. Gengler*, 574 F.2d 730 (3d Cir. 1978). However, "[t]he mere possibility that an item of undisclosed information might have helped the defense or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Agurs, supra*, 427 U.S. at 110–1, 96 S.Ct. at 2400.

In cases where a general request or no request is made,

"[t]he proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. *It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed.* This means that the omission must be evaluated in the context of the entire record.

"If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." [Footnotes omitted.] [Emphasis added.] *Agurs, supra* at 113–4, 96 S.Ct. at 2401–2.

We fail to see and Rose has not demonstrated how, under the circumstances of this case, pretrial knowledge of Edwards' psychiatric treatment or more specific information of the course of this treatment would have aided the defense in destroying Edwards' credibility with the jury and thus help create a reasonable doubt as to Rose's guilt of the Leary homicide.[6] This is particularly so in view of the fact that the jury was informed[7] of the psychiatric treatment, and that Edwards had suffered memory and judgment deterioration since his assault.[8]

**6.** In certain cases, however, the reliability of a witness may be so crucial to a finding of guilt or innocence that nondisclosure of evidence affecting the credibility of that witness may well amount to a nondisclosure of material evidence and, thus, even absent a specific defense request for such evidence, bring the case within the *Brady* rule as detailed in *Agurs. United States ex rel. Marzeno v. Gengler, supra; United States v. Dansker,* 565 F.2d 1262 (3d Cir. 1977) cert. dismissed 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978).

"If, for example, one of only two eyewitnesses to a crime had told the prosecutor that the defendant was definitely not its perpetrator and if this statement was not disclosed to the defense, no court would hesitate to reverse a conviction resting on the testimony of the other eyewitness. But if there were fifty eyewitnesses, forty-nine of whom identified the defendant, and the prosecutor neglected to reveal that the other, who was without his badly needed glasses on the misty evening of the crime, had said that the criminal looked something like the defendant but he could not be sure as he had only a brief glimpse, the result might well be different." *Agurs, supra,* 427 U.S. at 112, 96 S.Ct. at 2402 n. 21, quoting *The Prosecutor's Duty to Disclose,* 40 U.Chi.L.Rev. 112, 125 (1972).

**7.** See *United States v. Kaplan,* 544 F.2d 577 (3d Cir. 1977), where pretrial nondisclosure of documents determined by the court to be exculpatory did not result in a new trial where disclosure was made at trial and the evidence was effectively presented to the jury.

**8.** On cross-examination, after defense counsel had probed into the factual circumstances surrounding his shooting, the witness was asked:

"Q. Do you feel there has been any impairment to your memory and to your powers of judgment and recollections since this incident occurred and since your sitting here today.

"[District Attorney]: Objection.

"[Defense Counsel]: Your Honor, that is a crucial question with respect to identity.

"The Court: I will overrule the objection. You may answer.

"A. To a certain extent, yes.

\* \* \* \* \* \*

"Q. Explain your answer, sir. What do you mean 'to a certain extent, yes'?

"The Court: Do you understand it?

"The Witness: Yes.

"The Court: You may answer it.

"The Witness: I refuse to answer it.

"[Defense Counsel]: If the Court please, would you instruct the witness that when a question is put and the Court rules it is permissible that the witness must answer it?

"[District Attorney]: I will renew my objection for the reasons already stated.

"[Defense Counsel]: Your Honor, I will rephrase it and try to satisfy the witness.

"The Witness: May I say something?

"[Defense Counsel]: Yes.

"A. Any way you rephrase it I will refuse to answer it because it still leads to the same thing.

"Q. You say any way I—

"A. —any way you—

"Q. —rephrase it—

"A. —rephrase the question, yes, I have to refuse to answer it because it will all eventually lead up to the same thing which I do not care to discuss in this courtroom.

"Q. Let me try, sir. I want to begin by saying to you that I am here not to cause you any kind of problem or upsetness. You will pardon me if that has been the case. I simply want to know whether you have pointed out the right person. That is what the trial is all about.

"A. I have to answer you yes.

"Q. You said your powers of judgment and recollection have been impaired and that you sit there with some sort of liability with respect to your powers of judgment and recollection and the Court has directed you to answer as to why. You said that. Now will you answer that question?

"[District Attorney]: Objection.

"[Defense Counsel]: The Court has overruled the objection.

"The Court: I told him that he might answer it.

"[Defense Counsel]: Would you answer the question, sir?

"[District Attorney]: Objection.

"The Court: Well, let me see.

Is it a problem concerning your physical condition?

"The Witness: No, it is not.

"The Court: Does it concern your mental condition?

"The Witness: Yes, it is.

Rose next argues the trial court erred in failing to exclude the evidence of the Edwards and Crosley crimes.

"Because proof that a person has committed one crime—or even many crimes—is not in itself proof that he has committed another, and because there is a genuine danger that a jury may use the evidence of a separate crime to find a defendant guilty of the crime of which he is accused when it might not do so if restricted to the evidence of that crime alone, it is a well established rule of law that ordinarily evidence of other crimes is inadmissible in the trial of a separate crime. [Citations omitted.] But although the law is zealous to protect the defendant, who must be presumed innocent of the crime with which he is charged, from prejudgment, it is also concerned that the prosecution not be precluded from introducing legitimate evidence that is relevant to the judgment to be made with regard to the offense actually being tried." *Commonwealth v. Lasch*, 464 Pa. 573, 585–6, 347 A.2d 690, 696 (1973) [per Eagen, J., now C. J., with two Justices concurring].

To that end, while

"[i]t is black letter law that evidence of one crime is inadmissible against a defendant being tried for another crime, because the fact of the commission of one offense is not proof of the commission of another. [Citation omitted.] [T]here sometimes exist special circumstances which operate as exceptions to the general rule and bring the case within the equally well established principle that evidence of other crimes is admissible when it tends to prove (1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme, plan or design embracing commission of two or more crimes so related to each other that proof of one tends to prove the others; or (5) to establish the identity of the person charged with the commission of the crime on trial—in other words, where there is such a logical connection between the crimes that

"The Court: It is?
"The Witness: Yes."

proof of one will naturally tend to show that the accused is the person who committed the other. [Citation omitted.] When the evidence is relevant and important to *one* of these five issues, it is generally conceded that the prejudicial effect may be outweighed by the probative value." [Footnote omitted.] [Emphasis added.] *Commonwealth v. Peterson*, 453 Pa. 187, 197–8, 307 A.2d 264, 269 (1973).

Here, Edwards, Leary and Crosley were all shot in the back at close range in the course of or in an attempt to commit a robbery. The circumstances of and the manner in which the Edwards and Crosley crimes were committed were very similar to that of the Leary crime. All occurred within a short period of time and in a limited geographical area. Clearly, a close connection was established sufficient to permit the conclusion that all three crimes were committed by one individual, and to aid in establishing this individual's identity. Thus, evidence of the other crimes was properly admitted.

Rose finally contends the Commonwealth did not present sufficient evidence to sustain his conviction of murder of the second degree and of robbery. The test for evaluating the sufficiency of the evidence in a criminal case is whether, viewing the evidence in the light most favorable to the Commonwealth, and drawing all reasonable inferences therefrom upon which the jury could properly have based its verdict, there is sufficient evidence to enable the trier of fact to find beyond a reasonable doubt every element of the crime of which the accused has been convicted. See *Commonwealth v. Kramer*, 474 Pa. 341, 378 A.2d 824 (1977); *Commonwealth v. Wiggins*, 472 Pa. 95, 371 A.2d 207 (1977).

A review of the record shows the evidence is clearly sufficient to sustain the findings of the jury.

Judgments affirmed.

O'BRIEN, J., and POMEROY, former J., did not participate in the decision of this case.