549 A.2d 121

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**William DONAHUE, Appellant.**

Supreme Court of Pennsylvania.

Argued Nov. 12, 1987.

Decided Oct. 19, 1988.

534

A. Charles Peruto, Burton A. Rose, Philadelphia, for appellant.

Stephen B. Harris, Chief of Appeals, Doylestown, David W. Zellis, Asst. Dist. Atty., for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA and PAPADAKOS, JJ.

## OPINION ANNOUNCING THE JUDGMENT
## OF THE COURT

FLAHERTY, Justice.

The issues in this case are whether evidence of alleged prior acts of child abuse may be introduced in a prosecution for murder in which death of the victim was caused by alleged child abuse; and if such evidence may be admitted, the extent to which it may be challenged on cross examination.

At approximately 11:05 p.m. on March 23, 1983 Appellant Donahue and his girlfriend Claire Price took Claire's son Eddie to the emergency room at Holy Redeemer Hospital at Meadowbrook. The child, who was twenty-one months old, was dead on arrival at the hospital. Because of extensive bruises on the child's body, the examining physician suspected child abuse and reported the case to the police.

Police questioned both Donahue and Price that night, and two days later, the child's mother gave police a formal statement. Based on that statement, police arrested Donahue and charged him with the child's murder.

The trial began on August 15, 1983 in the Criminal Division of the Court of Common Pleas of Bucks County. On August 24, 1983, a jury found Donahue guilty of murder of the third degree, and on June 5, 1985 he was sentenced to seven and a half to fifteen years of imprisonment.

Evidence presented at trial was that Donahue and Price had been living together for approximately seven weeks. Each had custody of two children from former marriages. The group of six lived alternatively in Donahue's trailer and Price's apartment, located nearby. Price worked nights at a convalescent home, and Donahue, who was out of work because of a disability, stayed home with the four children. Among Donahue's duties was to assist in the toilet training of the smallest child, Eddie.

On March 23, Price returned home from work around 7:00 a.m. She saw her son Eddie, who at that time was apparently free of injury. Donahue took Eddie with him that

morning to do work cleaning out a garage, and when the two returned around noon, Eddie still appeared to be uninjured. Thereafter, Price took a nap and was awakened around 2:00 p.m. by a cry. She saw Donahue standing by the door of the trailer. He told her that the wind had blown the trailer storm door open and had knocked Eddie off the steps, but that Eddie was all right. Eddie went back outside to play. Donahue's son Billy had also been struck by the storm door earlier that day and sustained a cut lip.

According to Donahue, although Eddie appeared to be all right after he fell off the steps, around 3:30 p.m. one of the other children came in and told Donahue that Eddie had vomited outside. Donahue testified that he found Eddie sitting outside with vomit on his clothes and he took Eddie inside to give him a bath and change his clothes. Donahue woke Price around 4:00 p.m. so that the family could go to Price's mother's house for dinner. He also told her about Eddie's vomiting and suggested that they take Eddie to the hospital. Price declined to do that, thinking that Eddie had merely come down with the flu. Price noticed vomit on the ground as she left the trailer.

When the group arrived at Price's mother's house, Eddie stayed on the couch because he had been sick. While there, he began to "spit up" several more times. According to Donahue, Price asked her mother whether she should take the child "someplace," but the grandmother suggested that the child was simply ill and that he looked pale because he had been vomiting. N.T. Aug. 19, 1983, 53. Before the group left the grandmother's house, Donahue took Eddie to the bathroom.

When the group arrived home, the children were put to bed and the adults watched t.v. Price fell asleep in a chair and testified that sometime later she woke up and saw Donahue sitting in the kitchen holding a kitchen knife to his stomach. Price testified that Donahue said:

"Nobody's ever going to be able to forgive me for what I have done. I done something terrible.... You're never going to be able to trust me for what I have done."

\* \* \* \* \* \*

He said repeatedly, repeatedly that he had done something terrible and nobody was ever going to be able to forgive him for it. He said that our relationship was over. He said he would rather die than go to jail. He said that he was afraid he had killed somebody, was very concerned about Jennifer and Billy [Donahue's own children].

N.T. Aug. 15, 1983, 61–62.

Because Price did not know what was wrong with Donahue, she called Donahue's mother, who came over. Donahue asked Price to wait in the bathroom while he told his mother what the matter was. When Price went into the bathroom, Donahue told his mother that Eddie was dead. Mrs. Donahue checked the child, who was not breathing, unsuccessfully attempted artificial respiration, and then told Price that her son was dead. Price came out of the bathroom and sat at the table, apparently in a daze. She testified:

... Bill told me, he started crying and he looked at me and he said, "Claire—" he said, "I swear, I only punched him once in the stomach." ... He said he had punched him once, he swore up and down. Five minutes later, he's telling me he punched him again, he punched him again in the stomach to shut him up, apparently because Eddie had wet his pants.

N.T. Aug. 15, 1983, 63.

Donahue denied that he told Price he punched the child and he denied that he held a knife to his stomach. His testimony was that after he had watched t.v. for a while, he went into the children's rooms to see that they were covered. It was then that he found Eddie dead. He admits that when Price awoke, he was distraught and blamed himself for Eddie's death because he had not insisted that the child be taken to the hospital.

Two of the three issues raised by appellant in this case concern evidence of a prior act of child abuse he is alleged to have committed in 1980, three years prior to the incident in this case, when Donahue was living with a former wife.

In 1980, Donahue had been laid off from his regular employment and his wife had begun working. Donahue cared for his two children during the day, and one of his children, Billy [1], who was just over twelve months old, was being toilet trained at the time. N.T. Aug. 17, 1983, 13. Normally, Donahue would bathe the children and tell his wife to relax after she came home from work, but on March 7, 1980, Donahue's former wife bathed Billy for the first time in several days. While bathing the child, she saw bruises on the child's face, on his arms, down his spinal column, in the crack of his bottom, on his legs, and on the bottom of his foot. N.T. Aug. 17, 1983, 18. As a result, she took the child to the emergency room, where he was admitted to the hospital and stayed for four days. The two doctors who examined Billy diagnosed "possible battered child syndrome." *Id.*, 63. Immediately prior to this incident, the child was in Donahue's care during the day.

The emergency room doctor testified as follows concerning the injuries which the child had when he arrived at the hospital:

My examination at that time revealed multiple bruises and contusions about the patient's body, about the patient's face, choke mark on the neck, multiple bruises on the mid to lower portion of the spine, as well as a bruise on the buttock.

N.T. Aug. 17, 1983, 43. The doctor further explained his finding of child abuse as follows:

My opinion was based on the fact that the child presented [sic] to the emergency room with no previous history of any disease, no previous history of any bleeding disorder. The history from the mother was that the patient had bruises all over the patient's body for an unknown reason. Whenever we see a patient like that which appears otherwise with normal heart and lungs, must [sic] suspect child abuse, that is the standard and due to the patient's

1. Donahue's former wife now denies that Billy is Donahue's child, although this is the first public announcement she has made to that effect. N.T. Aug. 17, 1983, 39.

multiple bruises, as well as what clearly seems to be choke marks around the patient's throat area, my opinion at the time was that, was [sic] no other injuries, child abuse.

*Id.*, 43–44. When questioned about the possible causes of the child's bruises, the following exchange occurred:

Q.  A child, that's a toddler of 15 months playing with older children, what kind of bruises do they come up with?

A.  Could get the same kind of bruises. However, I find it unlikely that they would sustain choke marks.

Q.  Then what you are really saying is that these bruises that you saw are the kinds of bruises that could normally happen, except for what you call the choke marks, correct?

A.  That is correct.

*Id.*, 54.

Donahue explained Billy's bruises as having been received from two older children who were staying temporarily with his family and who played roughly with Billy. The child was returned to his parents' custody after he was released from the hospital and no charges of any sort were filed as a result of this incident.

The Commonwealth introduced evidence of the 1980 event on the theory that the prior incident showed Donahue's motive in the present case and demonstrates that the victim's injuries were not accidental. N.T. Aug. 15, 1983, 16, 17. Donahue's claim is that it was error to introduce evidence of the 1980 incident because (1) it was unduly prejudicial, (2) it was too remote in time, (3) the details of the crimes were not sufficiently similar to establish a common mental plan, and (4) there is no support in the record for the claim that the 1980 incident establishes a motive or negates Donahue's claim that the injuries to the deceased child were the result of accident.

The general rule is that evidence of past crimes is inadmissible to prove that the defendant committed the

crime with which he is presently charged. McCormick describes the rule as follows:

The disfavor for receiving proof of the character of a person as evidence that on a particular occasion he acted in keeping with his disposition is strongly felt when the state seeks to show that the accused is a bad man and thus more likely to have committed the crime. The long-established rule, accordingly, forbids the prosecution, unless and until the accused gives evidence of his good character, to introduce initially evidence of the bad character of the accused. It is not irrelevant, but in the setting of jury trial the danger of prejudice outweighs the probative value.

This danger is at its highest when character is shown by other criminal acts, and the rule about the proof of other crimes is but an application of the wider prohibition against the initial introduction by the prosecution of evidence of bad character. The rule is that the prosecution may not introduce evidence of other criminal acts of the accused unless the evidence is substantially relevant for some other purpose than to show a probability that he committed the crime on trial because he is a man of criminal character. There are numerous other purposes for which evidence of other criminal acts may be offered, and when so offered the rule of exclusion is simply inapplicable.

McCormick, *On Evidence*, § 190, pp. 447–448 (2d Ed., 1972). The "other purposes" of which McCormick speaks are enumerated in *Commonwealth v. Clayton*, 516 Pa. 263, 532 A.2d 385 (1987), where we cited *Commonwealth v. Rose*, 483 Pa. 382, 396 A.2d 1221 (1979) as standing for the proposition that

"evidence of other crimes is admissible when it tends to prove (1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme, plan or design embracing commission of two or more crimes so related to each other that proof of one tends to prove the others; or (5) to establish the identity of the person charged with the

commission of the crime on trial—in other words, where there is such a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other. [Citation omitted.] When the evidence is relevant and important to one of these five issues, it is generally conceded that the prejudicial effect may be outweighed by the probative value. [Footnote omitted.] [Emphasis added.]'', quoting *Commonwealth v. Peterson*, 453 Pa. 187, 197–8, 307 A.2d 264, 269 (1973).

*Id.* at 399–400, 396 A.2d at 1230.

516 Pa. at 276–77 n. 8, 532 A.2d at 392 n. 8. In short, although there is a general rule excluding evidence of other crimes, such evidence may come in under certain exceptions. The exceptions which the Commonwealth assert in this case are motive and absence of accident. Because we agree that evidence of the past event may come into evidence to negate Donahue's claim that the child's injuries were sustained in an accidental fall, we do not address the Commonwealth's alternate theory that the past event is also admissible to indicate motive.

Wigmore explains the accident exception as follows:

To prove intent, [and, therefore, the absence of accident], as a generic notion of criminal volition or willfulness, including the various noninnocent mental states accompanying different criminal acts, an entirely different process of thought is employed. *The argument here is purely from the point of view of the doctrine of chances*—the instinctive recognition of that logical process which eliminates the element of innocent intent by multiplying instances of the same result until it is perceived that this element cannot explain them all. Without formulating any accurate test, and without attempting by numerous instances to secure absolute certainty of inference, the mind applies this rough and instinctive process of reasoning, namely, that an unusual and abnormal element might perhaps be present in one instance, but that *the oftener similar instances occur with similar*

*results, the less likely is the abnormal element likely to be the true explanation of them.*

Thus, if A while hunting with B hears the bullet from B's gun whistling past his head, he is willing to accept B's bad aim or B's accidental tripping as a conceivable explanation; but if shortly afterwards the same thing happens again, and if on the third occasion A receives B's bullet in his body, the immediate inference (i.e., as a probability, perhaps not a certainty) is that B shot at A deliberately; because the chances of an inadvertent shooting on three successive similar occasions are extremely small.... *In short, similar results do not usually occur through abnormal causes; and the recurrence of a similar result (here in the shape of an unlawful act) tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act;* and the force of each additional instance will vary in each kind of offense according to the probability that the act could be repeated, within a limited time and under given circumstances, with an innocent intent.

\* \* \* \* \* \*

*It is not here necessary to look for a general scheme or to discover a united system in all the acts;* the attempt is merely to discover the intent accompanying the act in question; and the prior doing of other similar acts, whether clearly a part of a scheme or not, is useful as reducing the possibility that the act in question was done with innocent intent. The argument is based *purely on the doctrine of chances, and it is the mere repetition of instances, and not their system or scheme, that satisfies our logical demand.*

Yet, in order to satisfy this demand, it is at least necessary that prior acts should be *similar.* Since it is the improbability of a like result being repeated by mere chance that carries probative weight, the essence of this

probative effect is the likeness of the instance.... So, where the intent of an erroneous addition in a bookkeeper's accounts is in issue, the erroneous addition of a bill rendered to a former employer ten years before would have no significance, because it is still within the limits of ordinary casual error that such things should occur at intervals; but several other erroneous additions in the bookkeeper's own favor in the same year and the same book of accounts go to exclude the explanation of casual error, and leave deliberate intent as the more probable explanation. In short, there must be similarity in the various instances in order to give them probative value....

II Wigmore, *On Evidence,* § 302, pp. 241, 245, 246 (Chadbourn Rev.1979). (Emphasis added).

■ Thus, in order to avail itself of the accident exception to the rule that past crimes are usually not admitted into evidence, the Commonwealth must show that (1) the previous incident(s) are similar to the incident in question and (2) that a similar result obtained in both cases. The basic idea is that although two different children may, at different times, be seriously injured or killed while in a person's care, and that this may happen without his intentional conduct, as the number of such incidents grows, the likelihood that his conduct was unintentional decreases. It is merely a matter of probabilities.

A final requirement is that if evidence of a prior criminal incident is to be admitted under the accident exception, it must be determined by the court to be established by *substantial* evidence:

[I]t is clear that the other crime, when it is found to be independently relevant and admissible, need not be established beyond a reasonable doubt, either as to its commission or as to defendant's connection therewith, but for the jury to be entitled to consider it there must of course be substantial evidence of these facts, and some courts have used the formula that it must be "clear and convincing." And it is believed that before the evidence is admitted at

all, this factor of the substantial or unconvincing quality of the proof should be weighed in the balance.

McCormick, *On Evidence*, § 190, 451–452 (2d Ed., 1972).

■ In the present case, there was evidence that both children, Billy and Eddie, were being toilet trained at the time Donahue was caring for them, that he was partially responsible for their toilet training, that he himself was out of work, first because of a layoff and later because of a disability, that he cared for the children while his former wife and, later, his girlfriend were at work, that both children were seriously injured or killed while under his care, and that the nature of the injuries was evidenced in part by a pattern of bruises over the children's bodies. There is, in other words, substantial evidence of a prior criminal act and of a similarity in the two cases.

Because the former case tends to decrease the likelihood that the same man would be involved in two such similar accidents, the former incident is admissible as probative of whether the injuries in the second case were accidental, as Donahue claims they were.[2]

■ As to the claim that the two incidents were too far removed in time from each other, this Court stated in *Commonwealth v. Shively*, 492 Pa. 411, 424 A.2d 1257 (1981):

> Remoteness, in our view, is but another factor to be considered in determining if the prior crime tends to show that the same person committed both crimes. The degree of similarity between the two incidents necessary to prove common identity of the perpetrator is thus inversely proportional to the time span between the two crimes.

492 Pa. at 416, 424 A.2d at 1259. Although this case concerns the admission of prior crimes for the purpose of

---

**2.** Donahue asserts that there is nothing of record to negate his claim that the child's injuries were the result of an accident. This claim is without merit because it misapprehends the nature of the accident exception stated in *Clayton* and *Rose,* supra. The very existence of the alleged similar prior criminal incident tends to negate Donahue's claim that the present incident was accidental.

negating a claim that the child's death occurred because of an accident, not to show that the perpetrators of two crimes were the same person, the *Shively* analysis, nevertheless, is applicable. Remoteness is but another factor to be considered in determining whether a prior incident of alleged child abuse, three years earlier, tends to show that a second incident of child abuse was an accident. It may be that in a hypothetical case, a prior crime might have occurred so far in the past that this Court would not allow its admission, ruling, in effect, that it would be immaterial to the present controversy, but we need not reach that question in this case, for three years, on the facts of this case, is not unduly remote.

■ Finally, Donahue claims that the trial court erred in not allowing him to introduce evidence that his former wife, Cynthia Baxter, might have abused the child. Donahue proposed to introduce evidence which would have been presented in his case in chief that Baxter was seen choking Billy Donahue in March of 1981, the same child who was hospitalized in March of 1980 with choke marks. In other words, approximately a year after the hospitalization, Baxter, who testified as to the 1980 incident, was allegedly observed choking the same child. The court denied Donahue the opportunity to present this testimony, over the objection of defense counsel:

THE COURT: No, when did this occur?

THE PROSECUTOR: March of 1980.

THE COURT: You're too far away

DEFENSE COUNSEL: Your Honor, for the record, she actually observed Cindy—

THE PROSECUTOR: Quietly.

THE COURT: Okay, I know what you will say. Observed Cindy choking the child, Billy. This is March of 1981?

DEFENSE COUNSEL: Yes, your Honor. I suggest what we're talking about is the conduct of the parties. This is the only eyewitness as to actual physical abuse

shown by Cindy and not the defendant. I think it is extremely vital.

THE COURT: No, it is too remote. It would be in my opinion relevant were it to have happened within the immediate time frame of the charge but I won't admit it.

\* \* \* \* \* \*

THE COURT: I want it within the same period, two weeks before or after.

DEFENSE COUNSEL: Your Honor, it would be testimony that the parties separated and during the period of the separation when the child was in the control of Cindy, the marks constantly appeared on the child. I think that is indicative of the conduct.

THE PROSECUTOR: That is not what we heard yesterday.

DEFENSE COUNSEL: You have just put in the record the prejudice to this defendant and I have been curtailed in showing what Cindy has done and the fact that Cindy abandoned her children and.... ·

N.T. August 18, 1983, 12–14.

We believe the trial court to have been in error. Where the Commonwealth has introduced evidence of a former criminal episode in an attempt to convince the jury that Donahue committed the present crime, also at issue is Donahue's guilt in the former criminal episode. Since that is the case, Donahue must be permitted to introduce evidence of his innocence of the former crime, for where the Commonwealth has availed itself of the extraordinary device of former crimes evidence under the accident exception to the rule which would otherwise exclude such evidence, the accused must be allowed to affirmatively defend himself from the effect of such testimony. Fundamental due process requires no less. Since this defense was not allowed into evidence, a new trial must be granted.

Reversed and remanded for a new trial.[3]

**3.** Because of our disposition of this case, we do not address the following additional claims: (1) that a mistrial should have been granted because of police testimony referring to Donahue's refusal to

McDERMOTT, J., files a concurring opinion which ZAPPALA, J., joins.

PAPADAKOS, J., files a dissenting opinion.

LARSEN, J., did not participate in the consideration or decision of this matter.

McDERMOTT, Justice, concurring.

Although I concur in the grant of a new trial the Court should have gone further and discussed the trial judge's rulings limiting appellant's opportunity to establish Ms. Baxter's bias. See Opinion Announcing the Judgment of the Court at 17, fn. 3. In my view the judge impermissibly restricted appellant's inquiry.

ZAPPALA, J., joins in this concurring opinion.

PAPADAKOS, Justice, dissenting.

I must dissent to the use by the Majority of the general rule that evidence of past crimes is inadmissible to prove that a defendant committed the crime with which he is presently charged. I do not believe that this rule, with its exceptions, has any relevance to the issues presented in this case. Rather, Professor Wigmore's phrase "prior acts of a similar nature" as indicated in the quote used by the Majority, pp. 543–544 (II Wigmore, *On Evidence,* § 302, pp. 241, 245, 246 (Chadbourn Rev.1979)) is directly on point.

Appellant has been charged with criminal homicide caused by child abuse. Appellant explained this homicide as resulting from accident. To negate this accident theory, the Commonwealth introduced evidence that three years earlier, another child in Appellant's care also suffered substantial bruises which were thought, by medical authorities, to be the result of child abuse. In this prior event, no one

give a police statement and because another witness stated that Donahue remained silent after being confronted with the accusation that he beat the child to death; (2) that the trial court improperly limited Donahue's cross-examination of Cynthia Baxter for the purpose of showing bias; and (3) that the trial court improperly limited Donahue's direct evidence concerning Baxter's bias.

spoke of "crimes" nor was Appellant charged with a crime. Surely, not every bruised child has been criminally assaulted. If that were so, no parent would be free from criminal conduct in administering corporal punishment. And don't let anyone try to convince me that the hickory paddle did not abuse the sensitivity of my posterior.

Three years earlier, the Appellant was suspected of bruising a child by acts characterized as child abuse. Appellant made no denials at that time. The child, fortunately, survived. Now, three years later, Appellant is again suspected of bruising a child and, unfortunately, such bruises caused the death of the child. The prior act, not adjudged criminal, is similar in nature to the present act and may surely be shown to refute a claim of accident.

By referring to the prior act as a "crime" and permitting the introduction of evidence of prior "crimes" in this case, the Majority has, in effect, charged, tried and convicted Appellant of a "prior crime." This is not only unconscionable, but also unnecessary to the proper disposition of the issue presented.

Furthermore, I disagree with the grant of a new trial on the thin rationale advanced by the Majority. In essence, the Majority is advocating that a new trial be granted because the Appellant was not permitted to introduce irrelevant evidence. Appellant attempted to introduce evidence that his former wife had also been seen choking young Billy, the victim of the prior child abuse incident. The purpose, of course, was to challenge the credibility of the witness and to create a doubt as to whether Appellant was, in fact, responsible for the alleged child abuse in the prior event. This would certainly be proper if the Appellant had denied having abused the child in the prior incident and had implicated his prior wife. At trial, Appellant was shown to have explained that Billy's bruises were received from two older children who were staying temporarily with his family and who played roughly with Billy. He did not attempt to implicate his former wife as causing the bruises that took Billy to the hospital. Absent such an allegation, the evi-

dence that approximately one year after the stated incident she was seen choking Billy is totally irrelevant. This evidence was properly excluded and no new trial is warranted. I, therefore, must dissent from the grant of a new trial.