J-A11035-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| VICTOR CHARLES SMITH | : | |
| | : | |
| Appellant | : | No. 919 MDA 2023 |

Appeal from the Judgment of Sentence Entered April 21, 2023
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s): CP-36-CR-0004552-2021,
CP-36-CR-0005082-2020

BEFORE: BOWES, J., STABILE, J., and MURRAY, J.

CONCURRING AND DISSENTING MEMORANDUM BY MURRAY, J.: **FILED:**

**NOVEMBER 1, 2024**

I agree with the Majority that Appellant's second issue challenging the

denial of his severance motion merits no relief. However, the Majority would

vacate Appellant's judgment of sentence, based upon the trial court's

admission of prior bad acts evidence regarding Appellant's prior abuse of his

stepson, A.H. As I discern no error from the admission of A.H.'s testimony, I

must respectfully dissent from the grant of a new trial.

The underlying facts are as follows. From the time she was three years

old, K.C. (born in September 2004), lived with her biological father, Danny H.

(Father), as well as Father's paramour, Amanda Keeler (Amanda). Amanda

is not K.C.'s biological mother, but K.C. calls her "mom" and considers Amanda

to be her mother. Between January 2010 and December 2015, K.C. and her

younger brother, D.H. (born September 2007),[1] had regular, overnight visits with Father's mother (paternal grandmother) and paternal grandmother's paramour, Appellant. K.C. considered Appellant to be her step-grandfather.

In 2020, K.C. began experiencing nightmares. In late August or early September 2020, K.C. told Amanda that Appellant had sexually assaulted her. According to K.C., the assaults began when she was six years old and continued through age 13 years. The assaults took place when K.C. and D.H. slept overnight in Appellant's living room. According to K.C., while she slept, Appellant would touch her vagina. Appellant further had K.C. touch his penis, and made K.C. perform fellatio on him.

After K.C. reported the abuse, Amanda separately asked each of her other children whether anyone had inappropriately touched them. D.H. reported that when he was between six and seven years old, Appellant touched his penis on one occasion. The assault occurred while D.H. slept overnight in a blanket fort in Appellant's living room.

Significant to this appeal, Amanda disclosed Appellant's sexual assaults to Appellant's step-son, A.H. (born December 1996). A.H., who also had been sexually abused by Appellant as a child, reported Appellant's abuse of K.C., A.H. and himself to the Pennsylvania State Police (PSP). As Appellant had sexually assaulted A.H. in Delaware, the PSP notified the police in Delaware.

_____

[1] D.H. is the son of Father and Amanda.

- 2 -

Appellant argues that the trial court improperly admitted at trial evidence of Appellant's prior sexual abuse of A.H. Appellant's Brief at 15. Appellant claims his convictions were the result of the improper admission of A.H.'s testimony "describing an uncharged, geographically remote, distant in time and factually dubious accusation of a single incident of alleged sexual abuse." *Id.* at 17-18. Appellant contends A.H.'s testimony is the type of "propensity" testimony Pa.R.E. 404(a)(1) prohibits. *Id.* at 18.

Appellant compares this case to the circumstances in ***Commonwealth v. Kasko***, 469 A.2d 181 (Pa. Super. 1983). Appellant quotes the following analysis in ***Kasko***:

> The allegations in the two cases against appellant have certain similarities. They both involve children of a similar age group, having a family or personal link to the appellant. In both cases, appellant was accused of roughly the same type of misconduct. On the other hand, the two cases were separated by a substantial period of time and involved different victims. They occurred under dissimilar circumstances in that one allegedly occurred in the presence of appellant's girlfriend, later his wife, while the other did not. One case involved both a young boy and a young girl, whereas the other only involved a young girl. Finally, the misconduct alleged in this case is, sadly, not as rare as it should be, but is rather a common form of child abuse. Under these circumstances, we cannot agree that the two cases reach that high degree of correlation in detail required to show a common scheme, plan or design.

Appellant's Brief at 31 (quoting ***Kasko***, 469 A.2d at 185).

Appellant further argues the trial court improperly failed to consider the length of time between the crimes involving K.C. and D.H., and those involving A.H. *Id.* Appellant also points out the lack of geographic proximity and the

- 3 -

purportedly dissimilar nature between the offenses involving A.H. and those involving K.C. and D.H. *Id.* Appellant asserts the incidents involving A.H. took place in 2003, during daylight hours, in another state, and while A.H. lived with Appellant. *Id.* at 32. The events involving K.C. and D.H. took place nearly a decade later, at night, with others present in the home, while the alleged victims visited Appellant's home. *Id.* Appellant states, "the difference in the crimes with the lapse of time negates the Commonwealth's theory that [the incident involving A.H.] was part of a common plan, scheme or design." *Id.* at 33 (citation omitted).

> As this Court has recognized,
>
> [a]dmissibility of evidence is within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record.

*Commonwealth v. Lynn*, 192 A.3d 165, 169 (Pa. Super. 2018) (internal quotation marks and citations omitted).

> Relevance is the threshold for admissibility of evidence. Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact. All relevant evidence is admissible, except as otherwise provided by law.

*Id.* (citations and quotation marks omitted).

Pennsylvania Rule of Evidence 404 addresses the admissibility of prior bad acts evidence:

**(b) Other Crimes, Wrongs, or Acts.**

(1) *Prohibited Uses.* Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) *Permitted Uses.* This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

Pa.R.E. 404(b)(1)-(2).

Our Supreme Court has stated,

[e]vidence of one crime is generally inadmissible against a defendant being tried for another crime. ***Commonwealth v. Peterson***, … 307 A.2d 264, 269 ([Pa.] 1973). "[W]hile generally not admissible to prove bad character or criminal propensity," evidence of crimes, wrongs, or other acts "is admissible when proffered for some other relevant purpose so long as the probative value outweighs the prejudicial effect." [***Commonwealth v.***] ***Boczkowski***, … 846 A.2d [75,] 88 [(Pa. 2004)]; ***see also*** Pa.R.E. 404(b). Permissible purposes to admit other bad acts evidence include "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident," subject to the court's weighing of the probative value and the potential for unfair prejudice against the defendant. Pa.R.E. 404(b)(2).

***Commonwealth v. Crispell***, 193 A.3d 919, 936 (Pa. 2018).

Appellant challenges the admissibility of A.H.'s testimony under the common plan/scheme/design exception. In ***Commonwealth v. Hicks***, 156 A.3d 1114 (Pa. 2017) (OAJC), our Supreme Court summarized the principles underlying the admissibility of bad acts evidence under this exception:

- 5 -

This Court has long recognized an exception to the general inadmissibility of other crimes evidence where there is a striking similarity—or logical connection—between the proffered prior bad acts and the underlying charged crime. As early as 1872, in **Shaffner v. Commonwealth**, 72 Pa. 60 (1872), the [Supreme] Court described the importance of such a connection as follows:

> It is a general rule that a distinct crime, unconnected with that laid in the indictment, cannot be given in evidence against a prisoner. It is not proper to raise a presumption of guilt, on the ground, that having committed one crime, the depravity it exhibits makes it likely he would commit another. ... To make one criminal act evidence of another, a connection between them must have existed in the mind of the actor, linking them together for some purpose he intended to accomplish; or it must be necessary to identify the person of the actor, by a connection which shows that he who committed the one must have done the other.

**Id.** at 65.

In further explaining the logical connection standard, this Court has noted much more is demanded than the mere repeated commission of crimes of the same class, such as repeated burglaries or thefts. The device used must be so unusual or distinctive as to be like a signature.

**Hicks**, 156 A.3d at 1125-26 (some citations and internal quotation marks omitted).

As this Court explained in **Commonwealth v. Cosby**, 224 A.3d 372 (Pa. Super. 2019), **reversed on other grounds**, 252 A.3d 1092 (Pa. 2021),

> [a] determination of admissibility under the common plan/scheme/design exception must be made on a case[-]by[-]case basis in accordance with the unique facts and circumstances of each case. … When ruling upon the admissibility of evidence under the common plan exception, the trial court must first examine the details and surrounding circumstances of each criminal incident to assure that the evidence reveals criminal conduct which is distinctive and so nearly identical as to become the signature of the same perpetrator. Relevant to such a finding

> will be the habits or patterns of action or conduct undertaken by the perpetrator to commit crime, as well as the time, place, and types of victims typically chosen by the perpetrator. Given this initial determination, the court is bound to engage in a careful balancing test to assure that the common plan evidence is not too remote in time to be probative. If the evidence reveals that the details of each criminal incident are nearly identical, the fact that the incidents are separated by a lapse of time will not likely prevent the offer of the evidence unless the time lapse is excessive.

*Id.* at 398 (quoting **Commonwealth v. Frank**, 577 A.2d 609, 614 (Pa. Super. 1990)).

> [T]he courts must make sure that evidence of such circumstances have some relevance to the case and are not offered solely to inflame the jury or arouse prejudice against the defendant. **The court is not, however, required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form part of the history and natural development of the events and offenses for which the defendant is charged**….

**Commonwealth v. Bidwell**, 195 A.3d 610, 617 (Pa. Super. 2018) (emphasis added) (quoting **Commonwealth v. Lark**, 543 A.2d 491, 501 (Pa. 1988)). "While remoteness in time is a factor to be considered in determining the probative value of other crimes evidence under this theory, **the importance of the time period is inversely proportional to the similarity of the crimes in question**." **Commonwealth v. O'Brien**, 836 A.2d 966, 971 (Pa. Super. 2003) (emphasis added; citation omitted). Thus, remoteness in time is "another factor to be considered in determining whether a prior incident … [of abuse] tends to show that a second incident" of abuse was not an accident.

***Commonwealth v. Donahue***, 549 A.2d 121, 127-28 (Pa. 1988) (plurality)

(finding three years between incidents was not unduly remote).

In its Rule 404(b) Notice, the Commonwealth averred the following:

1.    The Commonwealth alleges that [when K.C. was between seven and twelve years old, Appellant] touched [K.C.'s] vagina, made her touch his penis, and made her put his penis into her mouth.  This would occur almost every time she went to visit [paternal] grandmother and [Appellant].  [K.C.] related that when she would spend the night, [Appellant] would sleep in the living room with her.  He would wake her up in the night and touch her vagina, make her touch his penis, and on at least two occasions[,] made her put his penis inside her mouth.  He would then tell her not to tell anyone.

4.    [K.C.] disclosed the abuse to [Amanda] … in September, 2020.  She then told her uncle, [A.H.], what happened to her. This caused [A.H.] to come forward with the same abuse he endured by [Appellant] when he was between 6 and 7 years old. [Appellant] is [A.H.'s] step-father.   [A.H.] reported to the Pennsylvania State Police what [Appellant] did to both him and [K.C.], which began the investigation by both the Pennsylvania State Police, and police in Smyrna, Delaware, which is where [A.H.] was abused.

5.    [A.H.] reported that when he was 6-7 years old, [Appellant] would make him watch pornographic movies.  He reported that on one occasion[, Appellant] made [A.H.] perform oral sex and analingus on him and [Appellant] performed oral sex on [A.H.] This disclosure began both investigations, and ultimately charges [against Appellant] in Lancaster, PA[,] for the abuse on [K.C.] and charges in Delaware for the abuse [of A.H.].

6.    The Commonwealth intends to bring in evidence of [Appellant's] prior acts on [A.H.,] **as it is relevant to show [Appellant's] common scheme and plan, opportunity, and show the complete story rationale of the sequence of events which form the history of the case and was part of its natural development.**

Rule 404(b) Notice, 9/24/21, ¶¶ 3-6 (emphasis added).

The evidence at trial established the following. Amanda testified that K.C. and D.H. visited with Appellant and paternal grandmother throughout their childhood. N.T., 9/14/22, at 197. Amanda confirmed her family temporarily resided at Appellant's home, from the end of August 2012 through March 2013. *Id.* at 198-99. During that time, Appellant, Appellant's paramour (paternal grandmother),[2] Amanda, K.C., D.H., D.H., Sr. (the father of D.H. and K.C. (Father)), and A.H. lived in the home. *Id.* at 199. K.C. and one of her brothers slept in bunk beds in the dining room, while Amanda and Father slept on the floor. *Id.* After about six months, Amanda, Father, and their children (including K.C. and D.H.) moved to Delaware. *Id.* at 200. After moving out, K.C. and D.H. continued to visit Appellant and paternal grandmother. *Id.*

Amanda testified that in August 2020, K.C. "was having nightmares." N.T., 9/15/22, at 203. According to Amanda,

> [K.C.] would be up during the night. You would just hear her get up, go to the bathroom. You know, she'd sleep, she just was always tired because she wasn't getting a whole lot of rest. And she just kept saying … I can't sleep at night, I can't sleep at night. I'm having nightmares.

*Id.*

Amanda testified that while away from her home in the fall of 2020

> my sister, Ashley, who was home with my kids, called me and said … you have to come home right now. Something's wrong with

---

[2] Appellant's paramour, Kathy H., is the paternal grandmother of K.C. and D.H.

[K.C.], she's hysterical and she will not tell me what's wrong until you get here. Like, you have to come home right now….

*Id.* at 204. Upon arriving home, Amanda went to her bedroom where she found K.C., hysterical. *Id.* at 207. Amanda testified:

I sat down on my bed. I held her. She was hysterical and she was just like, mom, I have to tell you something. And I said, what? And she said, the nightmares that I've been having, it's because [Appellant] touched me and made me do things to him. And it keeps replaying every night when [K.C.] goes to sleep, everything that he did to her. And she just went into detail about what he did.

*Id.* At the time she reported Appellant's assaults, K.C. was fifteen years old. *Id.* at 209.

According to Amanda, K.C. described Appellant's sexual assaults as follows:

[I]n the bathroom[, K.C.] would be in there and [Appellant] would … open the door and come into the bathroom there where she was and make her do the same things. And she said it happened to her every single time she went there.

*Id.* at 209. K.C. told Amanda that the assaults took place at night. *Id.* K.C. "said she would be sleeping and [Appellant] would wake her up." *Id.* at 201. K.C. further told Amanda the abuse began when K.C. was about seven years old. *Id.* at 210.

Amanda testified that, in response to K.C.'s claims, she asked each of her children

[if] anybody ever touched you in [a private body] area. And [J.] and [K.], my two youngest ones, both said no. [D.H.] said that he was woke up [*sic*] one time by [Appellant] touching him, like,

waking him up rubbing in [his genital] area. And he said, what are you doing, and [Appellant] just let him go back to sleep.

….

… He said … [Appellant] woke me up with his hand on top of my pants rubbing me down here ….

*Id.* at 212, 213-14. D.H. was about 13 years old when he reported Appellant's abuse to Amanda. *Id.* at 214.

Amanda testified that she called A.H.:

I told him everything that [K.C.] had just told me and I said, I don't know what to do, I'm gonna have to call the police. At this time it was later at night by the time I had given him a call. So I told him, … I plan on going to the police tomorrow. ….

*Id.* at 215.

At trial, K.C. testified that she is 18 years old and lives with Amanda and K.C.'s brothers, D.H., K., and H. N.T., 9/14/22, at 99. K.C. testified that she considered Appellant to be her step-grandfather. *Id.* at 101.

K.C. explained, "during the summertime when I was off school, any school breaks, Christmas breaks, spring break, I would be at my grandparents' house." *Id.* at 102. According to K.C., she would stay with her grandparents up to a week at a time. *Id.* This took place approximately "five, six times a year[,]" until she was 13 years old. *Id.*

When K.C. was six or seven years old (in 2010 or 2011), she and D.H. would spend the night at the home of Appellant and her paternal grandmother. *Id.* at 103. K.C.'s younger brothers had not yet been born. *Id.* When she

slept at her grandparents' house, K.C., D.H., and Appellant would sleep in the

living room, either

> [o]n the couch or on the floor or we would build forts a lot and we would sleep inside of a tent or a fort on [*sic*] the living room.
>
> ….
>
> So if we were to have a fort, we would usually always sleep in the fort, all of us.  And then if we were just laying on the floor, I usually slept on the floor but sometimes my brother would sleep on the couch.  …  But it was always in the living room that we slept.

*Id.* at 104-05.

K.C. testified that on one of these occasions, "we were at the house …

and I was actually asleep on the couch and I woke up to [Appellant] laying

right beside me with his hands down my pants."  *Id.* at 105.  According to

K.C., Appellant touched her vagina, underneath her underwear.  *Id.* at 106.

She stated, "Sometimes [Appellant] would put his fingers inside of me and he

would tell me in my ear not to tell anybody and that it was our secret."  *Id.*

at 106-07.  K.C. testified that this continued to happen, at night, "[a]nytime

that I was there."  *Id.* at 107.  K.C. confirmed that Appellant never slept in

the same room with paternal grandmother during their visits, only in the living

room with the children.  *Id.* at 108.

Amanda, K.C., and D.H. subsequently moved into Appellant's and

paternal grandmother's home.  *Id.* at 109-10.  K.C. stated that after moving

in, Amanda usually was present at the home.  *Id.* at 110.  The assaults

stopped at that time.  *Id.*  According to K.C., Amanda "would never leave me

and my brothers alone in the house without her." *Id.* They lived at Appellant's

house "[a] few months." *Id.* at 111.

After moving out, K.C. and her brothers returned to visiting paternal

grandmother and Appellant at their home. *Id.* at 112. K.C. testified she and

D.H. resumed sleeping in the living room. *Id.* at 109. She indicated that,

> [w]hen we started visiting … again, things started to progress and
> [Appellant] would make me touch his penis and he would … make
> me put it in my mouth and he would touch me more and it – just
> got worse.

*Id.* at 112. Appellant's assaults always took place at night. *Id.* at 113.

K.C. further stated Appellant "put his penis in my mouth and a few

times he would actually – he came in my mouth one time." *Id.* According to

K.C.,

> that was in the living room. That was actually in a fort. We were
> underneath of a fort and he woke me up and he had his penis
> outside his pants and I woke up and he put it in my mouth. It
> was only in there for a couple minutes and then he ejaculated in
> my mouth and then he left. He went to the bathroom. I turned
> over and went to sleep.

*Id.* at 114. K.C. was nine or ten years old at the time. *Id.*

K.C. testified regarding another incident:

So there was a time where … I was coming out of the bathroom
and there's another room right before the bathroom that has …
the freezer and the washer and dryer, and [Appellant] actually
pulled me into that room right there and touched me there. He
made me bend over and he pulled my pants down and he started
touching my vagina and putting his fingers inside of me.

*Id.* at 113. According to K.C., after each incident, Appellant "would make

sure to tell me that it was our secret. I wasn't allowed to say anything to

anyone else." *Id.* at 119. She stated Appellant "continued to tell me that throughout the years, that it was our secret." *Id.* The abuse ended when K.C. was about 13 years old. *Id.* at 115.

When asked why she never reported the abuse, K.C. stated,

I was scared. [Appellant], … he was angry and he would yell at my grandmother and I've seen him push my grandmother a few times, and … I was a lot smaller than my grandmother, so I thought if I would say anything that he would hurt me, too.

*Id.* at 119. K.C. described her last visit with paternal grandmother and Appellant, which took place in 2019:

So … [Appellant] was arguing with my grandmother. I'm not too sure what they were arguing about, but I heard the way that he was speaking to my grandmother, I seen him push her. So I said something, I told [Appellant], he's not going to talk to my grandmother like that, he's not going to put his hands on her.

… [H]e cussed me out and told me I could get out of his house. So I called my mom, I told her that he said that to me, and she was on the phone when we were all arguing and we packed our stuff and we sat outside until my mom made it to Lancaster.

*Id.* at 120.

D.H., almost fifteen years old at the time of trial, also testified. D.H. explained that he would visit his paternal grandmother and Appellant "[p]robably like three, four times in a year." *Id.* at 160. D.H. confirmed that

[m]e and [K.C.] would sleep downstairs in the living room. We usually had a tent made. And then my two little brothers would sleep upstairs [in paternal grandmother's room] and [Appellant] would sleep downstairs with us.

*Id.* at 161. D.H. testified that on one occasion,

- 14 -

> [w]e were sleeping in the tent fort and it was … kind of late at
> night and I had woke up because I felt rubbing on my genitals.
> And I woke up and I told [Appellant] to stop and he removed his
> hand and I went back to sleep.

*Id.* at 164. D.H. indicated that he was laying on the floor, and Appellant "was in the middle of me and my sister laying down." *Id.* at 165. According to D.H., he was between five and seven years old at the time. *Id.* at 166.

D.H. testified that he did not report the incident because "I was scared." *Id.* at 169. When asked why D.H. was scared of Appellant, he responded, "[b]ecause he was always really aggressive and he used to … hit my grandmother and stuff in front of us and yell." *Id.*

### The Prior Bad Acts Evidence

A.H., Appellant's stepson, testified regarding Appellant's prior abuse. A.H. testified that he, his mother (paternal grandmother), and Appellant lived in Delaware until he was eight or nine years old. *Id.* at 261. They moved to Lancaster in 2009, when A.H. was approximately 12 years old. *Id.* A.H. testified that when he was six or seven years old, while living in Delaware

> I was more or less instructed to do things. … [M]y pants were
> pulled down, and I don't even know the word to use of this, more
> or less, like masturbated in a way. Oral was a given, and then
> [Appellant] also turned around and kind of … bent over in a way
> and instructed me to put my mouth where his butt is.

*Id.* at 264. Appellant would be on his knees and instruct A.H. to "[l]ick his butt." *Id.* at 266. A.H. testified that Appellant abused him during the daytime when his mother was at work. *Id.* at 282.

A.H. did not report the incidents. *Id.* at 267. He explained it was

- 15 -

not a safe environment to where I felt safe to be able to come forward and have something actually done about it in a way. Almost trapped in a corner, if you will.

….

Just not a good family dynamic. Lot[s] of arguing in the home. [Appellant m]ore or less had negative connotations around him …. [I was s]cared of him more or less….

*Id.* at 268.

A.H. confirmed that while living in Lancaster, K.C. and D.H. had overnight visits at Appellant's home. *Id.* at 271. At the time, D.H. and K.C. would sleep in the living room with Appellant. *Id.* at 271-72. A.H. testified that he contemplated reporting Appellant's prior abuse at that time, but thought no one would believe him. *Id.* at 272. According to A.H., Appellant only slept in the living room when K.C. and D.H. were visiting. *Id.* at 275.

In August or September 2020, A.H. testified, he received a "distressed" phone call from Amanda about K.C. *Id.* Amanda told A.H. what had transpired between Appellant and the children. *Id.* at 276. A.H. testified that about a day or two later, he informed Amanda of Appellant's prior abuse. *Id.* A.H. subsequently told his mother (paternal grandmother) about the new abuse allegations against Appellant, and then reported Appellant's abuse to the PSP. *Id.* at 276-77.

On cross-examination, when asked why he didn't report Appellant's abuse earlier, A.H. stated that Appellant previously had made

a lot of threating motions with guns, police come to the house, there's going to be a shoot-out, like, you better grab a gun, like the whole nine yards.

So I mean, in my case, you know, if I tell anybody, the cops are coming, I don't want to put other people at risk or anybody like that.

*Id.* at 291.

Keeping in mind this Court's standard of review, I cannot conclude the trial court abused its discretion in admitting A.H.'s prior bad acts evidence under Pa.R.E. 404(b).  Appellant did not prey upon strangers or near-strangers, but rather upon family members, demonstrating the similarity in Appellant's choice of victims.  Appellant similarly assaulted each child by first touching each victim's genitals with his hands.  Appellant started abusing each child when he/she was approximately six years old.  Appellant abused each child in his home, taking advantage of his familial relationship to facilitate this abuse.  *See Commonwealth v. Luktisch*, 680 A.2d 877, 879 (Pa. Super. 1996) (concluding the trial court did not abuse its discretion by admitting evidence of the defendant's prior sexual abuse of other children in the same family to demonstrate a common scheme).

Appellant compares the circumstances of this case to those in *Kasko*. In *Kasko*, the trial court consolidated two cases for trial.  One case involved the defendant's sexual abuse of the minor niece of the defendant's girlfriend. *Kasko*, 469 A.2d at 183.  These offenses took place in February or March 1980, in front of his girlfriend, at his girlfriend's home.  *Id.*  The other case

involved the defendant's abuse of his minor niece and nephew, at his residence, between December 1980 and January 1981. *Id.* at 183-84. This Court reversed the defendant's judgment of sentence, concluding that the two cases demonstrated no common scheme or design. *Id.* at 184. Although the two cases involved children, a family link, and similar misconduct, the Court emphasized "the two cases were separated by a substantial period of time and involved different victims," of both genders. *Id.* at 185. Thus, this Court reversed and remanded for a new trial. *Id.* at 186.

Here, by contrast, **all victims were step-relations of Appellant**. This case does not involve "totally different ages," as each child was about six years old at the time when the assaults began. *See id.* at 183. Further, each offense involved Appellant first touching the child's genitals, and each took place in Appellant's home. Under these circumstances, I would conclude *Kasko* is distinguishable.

I further agree with the trial court's rationale, as stated in its opinion:

> Pa.R.E. 404(b)(2) states that evidence of other crimes "are admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." After [K.C.] disclosed the abuse done to her, A.H., her uncle, came forward with his own testimony of abuse.
>
> A.H. reported this information to the … PSP[], which caused an investigation by both the PSP and Delaware State Police. His testimony of abuse fit a similar pattern committed by the Appellant, *e.g.*[,] abuse starting around the same age. Evidence of common scheme, plan, or design is permitted. *Lark*[, 543 A.2d] at [497]. As such, this Court found that A.H.'s testimony is admissible.

- 18 -

A.H.'s testimony is permitted under Pa.R.E. 404(b), even in light of its dissimilarities from the present case's circumstances. In Appellant's Post-Sentence Motion, Appellant averred that A.H.'s circumstances were too dissimilar from the acts against [K.C.] and [D.H.] to be admitted under Pa.R.E. 404(b). ... In rape cases, dissimilarity does not automatically conclude exclusiveness[,] as "it is impossible for two incidents of sexual assault involving different victims to be identical in all respects." [] **Cosby**, 224 A.3d [at] 402…. Rather, it is the pattern itself, "analogized to a script or playbook of criminal tactics that worked for the offender when committing past crimes," that determines admissibility. **Id.** As described above, Appellant's actions towards each victim fit a certain pattern. **This pattern, when analyzed through the evidence, created a complete story of abuse.** Thus, this [c]ourt was justified in permitting A.H.'s testimony under Pa.R.E. 404(b).

Trial Court Opinion, 9/26/23, at 6 (emphasis added). I discern no error or abuse of the trial court's discretion, and would adopt the trial court's legal analysis. **See id.**; **see also Commonwealth v. Newman**, 598 A.2d 275, 279 (Pa. 1991) (stating that a commonality of roles and situs establishes a common design).

Moreover, I observe that "[o]ur Supreme Court has consistently recognized that admission of distinct crimes may be proper where it is part of the history or natural development of the case, *i.e.*, the *res gestae* exception." **Commonwealth v. Brown**, 52 A.3d 320, 326 (Pa. Super. 2012) (citations omitted). The *res gestae* exception permits the admission of evidence of other crimes or bad acts to tell 'the complete story.'" **Commonwealth v. Hairston**, 84 A.3d 657, 665 (Pa. 2014). It applies where the other crimes or bad acts "were part of a chain or sequence of events which formed the history

of the case and were part of its natural development." ***Brown***, 52 A.3d at 326 (citation omitted). Such evidence may be admitted … "only if the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404(b)(2).

I cannot conclude the trial court's admission of A.H.'s testimony, under the *res gestae* exception, would constitute an abuse of discretion. Further, its probative value outweighed any prejudice cause by its admission. A.H.'s testimony was a necessary part of "the complete story" of the case. As set forth above, although K.C. reported the sexual assaults to her mother, it was A.H. who reported the assaults to the PSP. A.H.'s testimony further provided context to Appellant's abuse of K.C. and D.H., as A.H. was present in the house when the abuse occurred. His testimony further explained why A.H. did not caution A.H., K.C., or Amanda about Appellant. I thus disagree with the Majority's conclusion that the trial court abused its discretion in admitting A.H.'s testimony at trial. As such, I would affirm Appellant's judgment of sentence.